## NONANTUM INV. CO. v. MARYLAND CASUALTY CO.

No. 2567.

Circuit Court of Appeals, First Circuit.

Feb. 25, 1932.

J. N. Welch, of Boston, Mass. (Hale & Dorr and David Burstein, all of Boston, Mass., on the brief), for appellant.

Arthur E. Whittemore, of Boston, Mass. (Nutter, McClennen & Fish and E. Curtiss Mower, Jr., all of Boston, Mass., on the brief), for appellee.

Before BINGHAM and WILSON, Circuit Judges, and MORRIS, District Judge.

MORRIS, District Judge.

This is a suit on a bond of fidelity insurance and comes to this court on the exceptions of the plaintiff from an order of the trial judge directing a verdict for the defendant. The principal issue in the case is whether the application for the bond contained such misrepresentations as to vitiate the policy.

Two errors are assigned as follows: "1. The court erred in admitting in evidence over the objection of the plaintiff the application dated July 22, 1926, for the bond on which this suit was brought. 2. The court erred in directing the jury on its own motion upon all the evidence to return a verdict for the defendant at the close of the plaintiff's case."

The plaintiff, a corporation engaged in the business of loaning, money on second mortgages and on construction loans, made application in writing to the defendant for a bond insuring the fidelity of its treasurer, one Amato Pescosolido.

The bond was dated July 26, 1926, and was the ordinary fidelity bond by the terms of which the defendant agreed to reimburse the plaintiff for any loss not exceeding $25,000 sustained by reason of the fraud, dishonesty, forgery, embezzlement, wrongful abstraction, or willful misapplication of Pescosolido. The bond recites certain express conditions, not important in this action, precedent to the right of the employer to recover thereunder. These conditions consist principally of various requirements with regard to notice and proof of loss to be given by the insurer. It also contains the following provision: "This bond was executed upon the following express conditions which are conditions precedent to the right of the employer to recover thereunder. * * * 2. That the employer has no knowledge of any act of fraud or dishonesty committed by the employee while in the service of the employer or elsewhere; that if the employer becomes aware of the employee committing any acts of fraud or dishonesty the employer shall, within ten (10) days thereafter, notify the company by registerd letter, addressed to the company at its home office, Baltimore, Maryland, and the company shall not be liable for any loss subsequently incurred by the employer through any act of the employee unless the company shall have consented, in writing, to continue the liability under this bond."

There was evidence that the annual premiums on the bond were paid in August, 1926 and 1927. The plaintiff admitted that at a material time the defendant tendered to the plaintiff the premiums received on the bond, which tender was refused by the plaintiff. The letter accompanying the tender stated that the purported bond never became binding upon the defendant because of misrepresentation and nondisclosure of material facts in its procurement.

Evidence was presented from which losses under the bond could have been found.

The bond does not make reference to any application as having been executed by the insured or having been received by the company. It does not state that it was issued on the basis of or reliance on any statement oral or written made by the employer or any person in its behalf prior to its execution.

On cross-examination of Cardarelli, president of the plaintiff corporation, the defendant offered in evidence the application for the bond. After the witness had identified his signature, the trial judge admitted it in

evidence over plaintiff's objection and exception.

The application was dated at Newton, Mass., July 22, 1926. It was signed: "Nonantum Investment Co., by James Cardarelli, President, Official Capacity."

When the blank application was furnished the plaintiff to be filled out, it was accompanied by a letter signed by defendant's president containing the following: "An application has been made to this company to issue to you a fidelity bond for Mr. Amato Pescosolido as treasurer in your service, at 402 Watertown St., Newton, to the amount of $25,000. Before passing on the said application the company must have answers to the following questions:" This was followed by a list of questions on the margin of which the following appeared: "Bond cannot be executed until this form is fully completed and returned to the company."

At the conclusion of the questions to be answered, the application contained the following statement: "It is agreed that the above answers are warranties and constitute the basis of and form a part of the consideration of the bond executed or about to be executed by the Maryland Casualty Company in favor of the undersigned upon the person above named, and also all continuations or renewals thereof or substitutions therefor, until superseded by other written answers similarly furnished to and accepted by the said company."

The application for the bond stated in substance that plaintiff's business was secondhand mortgages and construction loans; that it had no knowledge or information, and was aware of no habit of the applicant (Pescosolido) or any circumstances which might unfavorably affect the risk; that applicant's duties embraced the custody of cash and that the largest amount he would be likely to have under his control at any one time was $20,000, depending on how investments were made; that applicant would have control of securities, that is, mortgages and notes, and that this control would be joint with the president and directors; that the applicant would be authorized to pay out cash in his custody on the plaintiff's account, the authority therefor being given by a vote of the board of directors; that applicant would be permitted to retain as balance in his hands whatever might be on hand to be paid out on loans, this to be deposited in banks in the name of the plaintiff; that at least once in every three months the applicant's books, accounts, stock, and securities would be inspected and audited and verified with funds on hand or in bank by the whole board of directors in its official capacity; that applicant had always faithfully, honestly, and punctually accounted to plaintiff for all moneys and property theretofore under his control; that applicant's accounts as of July 22, 1926, were in every respect correct, and proper securities, property and funds are on hand to balance his accounts; that applicant was not then indebted to the plaintiff; and that plaintiff had never sustained loss through the dishonesty of anyone holding the position of the applicant.

The defendant in answer to plaintiff's declaration on the bond denied each and every allegation in plaintiff's writ, and further set forth that the consideration for said purported bond had failed and that warranties made by the plaintiff in connection with the procurement and renewal thereof had been broken, and that said purported bond was never binding upon the defendant because of fraud in its procurement, and that seasonably upon the discovery thereof the defendant notified the plaintiff that said bond was not binding upon it and made legal tender to the plaintiff of premiums received with interest to date of tender, and that because of said fraud plaintiff was barred from recovery in its said action.

The plaintiff in advance of trial filed a motion for specifications and particulars. On April 10, 1930, the defendant specified the questions and answers in the application for the bond which it claimed were in whole or in part false and known to be false to the plaintiff and to the persons making the same. The material questions and answers relied on as a defense are as follows:

5 (e). Have you any knowledge or any information or are you aware of any habit of the applicant or any circumstances which might unfavorably affect the risk to the surety on the bond applied for? If so, state particulars. Ans. No.

12 (a). At what intervals will applicant's books, accounts, stock, and securities be inspected and audited and verified with funds on hand or in bank? Ans. At least once in every three months.

12 (d). By whom will above inspections and audits be made? Ans. Whole board of directors.

13 (a). Has applicant always faithfully, honestly, and punctually accounted to you for all moneys and property heretofore under his control or custody as your employee? Ans. Yes.

13 (b). Are applicant's accounts at this date in every respect correct, and proper securities, property, and funds on hand to balance his account? Ans. Yes.

14 (a). Is applicant now in debt to you? Ans. No.

The defendant also alleged that at the time the bond was written the employer did have knowledge of an act or acts of fraud or dishonesty committed by the employee while in the service of the employer, and that after the bond was written the employer became aware of the employee committing acts of fraud or dishonesty and did not within ten days thereafter notify the company as required.

As hereinbefore stated, the bond makes no reference to the application.

■ It is a general principle that warranties, as distinguished from mere representations, must be a part of the policy itself or incorporated therein by reference. Unlike misrepresentations, if false or untrue, they render the policy voidable by the insurer wholly irrespective of the materiality of the statement or promise: Such is the common-law rule applicable to insurance independent of statute. Bankers' Reserve Life Co. v. Matthews (C. C. A.) 39 F.(2d) 528, 535; Rice v. Fidelity & Deposit Co. of Maryland (C. C. A.) 103 F. 427; Campbell v. Business Men's Assurance Co. (D. C.) 31 F.(2d) 571; Missouri, Kan. & Tenn. Trust Co. v. German Nat. Bank of Denver, Colorado (C. C. A.) 77 F. 117.

This common-law distinction between warranties and misrepresentations appears to be abolished in Massachusetts by statute.

Mass. Gen. Laws, chap. 175, § 186, provides that: "No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss."

In the case of White v. Provident Savings Life Assur. Soc., 163 Mass. 108, 115, 39 N. E. 771, 773, 27 L. R. A. 398, it is said with reference to the above statute: "As to mere representations, the statute may well be held to be only declaratory, but as to warranties it made a new rule. * * * Misstatements of fact, whether the statement is said to be by the parties a warranty or a representation, are equally misrepresentations, and are placed in each case upon the same footing by the statute which applies to them if the statements are called 'warranties' by the parties no less than if they are mere 'representations.' * * *"

In the case of Mutual Benefit Life Insurance Co. v. Robinson (C. C.) 54 F. 580, it is held that where an application for insurance is made in one state, by a resident and citizen thereof, to agents located therein, to an insurance company of another state, the policy, though actually issued in such other state to take effect by its terms upon payment of first premium, and the policy is delivered and premium paid in the state where the application is made, the law of the state governs the interpretation and force of the contract. Busher v. New York Life Ins. Co., 72 N. H. 551, 58 A. 41.

■ This appears to be a comprehensive statement applicable to insurance contracts. The contract in the case at law is governed by the laws of Massachusetts. Pritchard v. Norton, 106 U. S. 124, 1 S. Ct. 102, 27 L. Ed. 104; Albro v. Manhattan Life Ins. Co. (C. C.) 119 F. 629; Provident Savings Life Assur. Soc. v. Hadley (C. C. A.) 102 F. 856.

■ The first assignment of errors relates to the admissibility of the application for the policy. The plaintiff claims that the application, not having been incorporated in the policy, etc., like all other collateral agreements prior to the execution of a written contract, becomes irrelevant and ineffective being deemed merged therein.

There are several reasons why this contention cannot be sustained. The first is that positive fraud vitiates all contracts, obligations, deeds of conveyance, and even records and judgments of courts. It is always admissible to show that a written contract was induced by fraud. Jones v. Emery, 40 N. H. 348. The second reason is found in the language of the Massachusetts statute which provides that no oral or written misrepresentation or warranty made in the negotiation of a policy of insurance shall vitiate it except on conditions prescribed by the statute. Clearly the language of the act implies that the written application is admissible in evidence. The third reason is found in the application itself, which, though called an application, is in itself an agreement, and one that clearly indicates that it is a part of another written instrument about to be executed. It is not an instrument standing entirely alone, but is a written agreement to be interpreted in connection with another agree-

ment sufficiently identified, which is the bond itself.

It is further claimed by the plaintiff in argument that Cardarelli had no authority to make and sign the application. There is no suggestion in the evidence of a denial of the application by the plaintiff. A bond had been asked for by the board of directors. The application was attached to a letter addressed to the Nonantum Investment Company at its place of business. The answers requested by the application were signed by Cardarelli in his official capacity as president. The corporation paid the premiums on the bond for two years. There is nothing in the evidence to show that the plaintiff ever disaffirmed the act of its president in his official capacity with reference to the procurement of the bond. To prove that Cardarelli was not acting for his corporation when he signed the application proves too much for the plaintiff's case. The application specifically states that the bond cannot be executed until the application is fully completed and returned to the defendant. Eliminate the application and there would have been no bond, and except for the application there was no meeting of the minds of the parties. See American Express Co. v. Kimball & Nutter, 77 N. H. 52, 54, 86 A. 258.

The action of Fidelity & Deposit Co. v. Courtney, 186 U. S. 342, 22 S. Ct. 833, 836, 46 L. Ed. 1193, was an action wherein recovery was sought on a bond of indemnity to save a bank harmless against any loss which it might sustain by reason of any fraud committed by its president. During the trial the court refused to permit the defendant to read as evidence to the jury a letter written by defendant to the bank concerning a renewal of the policy to which the cashier of the bank replied that the president had performed his duty in an acceptable and satisfactory manner and he (the cashier) knew no reason why the bond should not be continued.

It appeared that the original bond was based upon an application containing questions and answers similar in effect to those in the instant case. It was held that it was error to refuse to admit the correspondence in evidence. The case is so clearly applicable to both the question of the admissibility of the application and the authority of Cardarelli that we quote from it at considerable length. In the course of the opinion it is said: "The bank had notice from the terms of the original bond that it was issued in reliance upon statements and representations made on its behalf to the surety company, and that, in the ordinary course, renewals,

which were to be optional with the surety company, might also be based upon further statements to be made on behalf of the bank. * * * It was a reasonable and proper precaution, in anticipation of a desired renewal, to propound the inquiries which were submitted by the surety company. The inquiry was contained in a written communication, addressed *to the bank*, it was received by the bank, and it was proper to presume that it was delivered to the official who made reply thereto, by authority of the bank, he being the executive officer who was charged with conducting the correspondence of the bank. We think the making of the certificate was an act done in the course of the business of the bank, by an agent dealing with the surety company for and on behalf of the bank. It did not purport to be, nor was it designed to be, the mere personal representation of the individual who filled the office of cashier, but it was an official act, performed on behalf of the bank. The information solicited was such as was proper to be asked of and communicated by the bank, and as the renewal was presumably made upon the faith of the statements contained in the certificate, the bank ought not to be heard, while seeking to obtain the benefits of the stipulations agreed to be performed by the surety, to deny the authority of its officer to make the representations which induced the surety to again bind itself to be answerable for the faithful performance by McKnight of the duties of his employment."

The presumption is that when he signed his application for the bond Cardarelli was acting with authority on behalf his corporation. This presumption is not rebutted by any evidence in the case.

The second assignment of error relates to the sufficiency or insufficiency of the evidence. The plaintiff contends that the evidence presented a question for the jury and that the court erred in directing a verdict for the plaintiff.

In reviewing the evidence we first notice the sequence of events leading up to the procuring of the bond in suit. The directors called for a bond in 1924, but did not get it. Cardarelli became president of the plaintiff corporation in July, 1926. The application for a bond was dated July 22, 1926, and the bond bears date of July 26, 1926. It appears that when Cardarelli became president he became actively engaged in an investigation of the corporate affairs. During the short period of the intervening twenty-six days Cardarelli and the board of directors had ap-

pointed a committee to investigate the accounts of the treasurer, Pescosolido; the committee had made its investigation and reported at a meeting of the board of directors that there was supposed to be $17,000 on hand; and that they had visited the Union Market National Bank, the only depository of the plaintiff, and found that there was only a small amount on deposit. Pescosolido, who had not attended the meetings of the board of directors for several months prior to the writing of the bond, was not present at the meeting. While it does not appear that the board passed any definite vote with reference to the $17,000, the opinion was expressed that Pescosolido must bring it back; they did not want him to use it. A second directors' meeting was called and notice was sent to Pescosolido to be present. He appeared and was requested to make payment. He said he would do so if he was given sufficient time. The directors asked him where the money was and he said he had taken it and used it for his own purposes. When asked why he was using the corporation's money, he said he had always done this since the corporation was started and that it was a right given him by the prior board of directors. He said that if he was paid more salary he would return the money into plaintiff's bank account. His salary was raised to 15 per cent. of the net profits, but there is no competent evidence to show that he returned the $17,000 as directed. An examination of the bank deposit sheets from month to month during 1926 discloses that at no time was there a cash balance on hand of much over $6,000 and for most of the time it was substantially less than this sum. Cardarelli testified that on July 26, 1926, when the bond was given he had no knowledge of any acts of fraud or dishonesty on the part of Pescosolido prior to that date and nothing happened at the directors' meeting when the $17,000 was discussed which charged Pescosolido with any act of dishonesty. Cardarelli further testified that he had confidence in him and continued to have confidence in him after the bond was written. His accounts were examined by a certified public accountant and an audit of his books made at the end of the year 1926. This audit was introduced in evidence and showed cash on hand in the amount of $1,771.71 which was verified only by a certificate from Pescosolido as treasurer that he held that amount for the account of the Nonantum Investment Company, Inc. No quarterly inspection, audit, and verification was made by the board of directors after the bond was written. Pescosolido made a state-ment every three months which was checked over by a special committee, but it did not at any time after October, 1927, examine the mortgages and notes on hand and verify the securities with the treasurer's books. The shortage in Pescosolido's account began August 4, 1927. The subsequent items of plaintiff's loss show in each case the receipt by Pescosolido of corporate funds and non-payment thereof to the corporation.

Several of the items of loss resulted from the delivery of mortgages and notes on assignment or discharge and the withholding by Pescosolido from the corporation's depositories of the amount received therefrom. Whenever anything was done with any of the securities of the Nonantum Investment Company, the board of directors were supposed to pass on the action to be taken and that situation was supposed to exist from the time the bond was written throughout the entire period until 1928.

In seeking to obtain the bond of indemnity the law requires that the applicant observe the utmost good faith and deal fairly and honestly with the insurer in respect of all material facts about which inquiry is made in the application and as to which the applicant has or should presume to have knowledge or information. Stipcich v. Insurance Co., 277 U. S. 311, 317, 48 S. Ct. 512, 72 L. Ed. 895.

One of the conditions of the Massachusetts statute, supra, is that to avoid a policy the misrepresentation or warranty be made with actual intent to deceive. Where one has made a false representation knowing it to be false, the law infers that it did so with intention to deceive. Hammatt v. Emerson, 27 Me. 308, 326, 46 Am. Dec. 598; Claflin v. Commonwealth Insurance Co., 110 U. S. 81, 95, 3 S. Ct. 507, 28 L. Ed. 76; Fidelity & Casualty Co. v. Bank of Timmonsville (C. C. A.) 139 F. 101.

Ordinarily false representations will not avoid a policy unless the assured knew they were false or he was chargeable with such knowledge. Security Life Insurance Co. v. Brimmer (C. C. A.) 36 F.(2d) 176, 179; Wharton v. Ætna Life Insurance Co. (C. C. A.) 48 F.(2d) 37.

It may be conceded that if the case were to be put on the question of "actual intent to deceive," the evidence as to whether or not Cardarelli signed the application for the bond with actual intent to deceive, disclosed a jury question.

It might be found, from the fact that he

had absolute confidence in Pescosolido, that therefore there was no intentional deception or fraud in answering question 5 (e), supra. McDonough v. Metropolitan Life Ins. Co., 228 Mass. 450, 117 N. E. 836; Smardon v. Metropolitan Life Ins. Co., 243 Mass. 599, 137 N. E. 742. But even so we do not see how the answer to 14 (a), supra, can be explained. It was a plain, simple question—"Is applicant now in debt to you?" The answer is: "No." We think the crux of the case turns on the second condition in the Massachusetts act, which is whether or not the matter represented or made a warranty "increased the risk of loss."

Question 5 (e) required the applicant to disclose any knowledge or information or habit of the applicant or any circumstances which might unfavorably affect the risk to the surety on the bond applied for. Within a few days prior to the signing of the application Cardarelli and the directors of the plaintiff corporation had ascertained that Pescosolido as treasurer of the corporation had had in his possession $17,000. which he had used for his own purposes and which he could pay back only if given time. Cardarelli in referring to the report of the committee appointed to investigate the treasurer's accounts testified: "It was said that they found $17,000 short, and they asked him (Pescosolido) why he was using the corporation's money. Mr. Pescosolido turned around and said: 'I always did, since the corporation was started; that was a right given to me by the board of directors and stockholders because I was not getting enough salary.' "

This is a most remarkable explanation of Pescosolido's shortage in his accounts as treasurer and if true is indicative of a state of affairs which would deter any surety company from entering into any obligation whereby it would obligate itself to reimburse the corporation for any loss it might sustain by reason of any wrongful abstraction or willful misapplication of its treasurer.

Two representations in the application were positively untrue. In 13 (a) it is represented that the applicant has "always faithfully, honestly and punctually accounted for all monies under his control." And in 14 (a) it is stated that the applicant is not now in debt to the corporation.

It is argued by the plaintiff that the witness Cardarelli may have believed that prior to the execution of the application the money used by Pescosolido had been paid back. Within a few days prior thereto Cardarelli and his codirectors had been told by Pesco-

solido that he would pay the $17,000 back if they would give him time. It does not appear that Cardarelli or any one else checked his accounts at or about the time the application was made to prove that the money had been paid back.

A statement in an application for insurance of a fact which is untrue and which the assured states knowing it to be untrue, with intent to deceive, or which he states positively as true not knowing it to be true and which has a tendency to mislead, is a material misrepresentation, and such fact is in either case material to the risk. Shaw, C. J., in Daniels v. Hudson River Fire Insurance Co., 12 Cush. (Mass.) 416, 59 Am. Dec. 192.

The fact that Cardarelli may not have regarded these answers material does not help the plaintiff's case. It is immaterial whether the applicant did or did not actually or knowingly intend to deceive the defendant if as a matter of law the false representations increased the risk of loss. The fact that the company's treasurer was in the habit of devoting any surplus funds to his own use, even with the expectation of paying them back when required, was so unreasonable and unusual in the management of corporate affairs that it must be held that it increased the risk of loss. Most defalcations start in just this way. It was likely there would come a time as it did when the funds so devoted to private use would not be forthcoming. See National Surety Co. v. Globe Grain & Milling Co. (C. C. A.) 256 F. 601, 605, 4 A. L. R. 552, wherein it is said: "The parties to the contract were not on a plane of equal opportunity for information, and the fact that Hayes' account was overdrawn, and that he was in the habit of overdrawing the same at and before the time when the contract was entered into, was one that should not have been withheld from the surety company. It is not conceivable that the surety, if advised of that habit, would have entered into the contract." See, also, Guarantee Co. of North America v. Mechanics' Savings Bank & Trust Co., 183 U. S. 402, 22 S. Ct. 124, 46 L. Ed. 253.

We hold as a matter of law that the misrepresentations contained in the answer to questions 5 (e), 13 (a), and 14 (b) are material misrepresentations and such that belief in their truth materially increased the risk, and vitiated the contract.

In view of what we have said it does not seem necessary to prolong this opinion by a discussion of the so-called promissory representation contained in 12 (a) and 12 (d).

336

The court may direct a verdict for either party whenever, under the state of the evidence, it would be compelled to set aside one returned the other way. Monroe v. British & Foreign Marine Ins. Co. (C. C. A.) 52 F. 777; Rainger v. Boston Mutual Life Ass'n, 167 Mass. 109, 44 N. E. 1088.

It follows that the District Judge did not err in directing a verdict for the defendant.

The judgment of the District Court is affirmed, the defendant to recover its costs.